# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59707-1-II |
| Respondent, | |
| v. | |
| MICHAEL OWEN FREEMAN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, C.J.—Michael Owen Freeman appeals his conviction of first degree felony murder predicated on attempted robbery in the first degree. Freeman argues that this court should reverse his conviction for first degree felony murder and dismiss because no rational trier of fact could determine, based on the evidence, that Freeman attempted to commit robbery. The State argues that sufficient evidence supports Freeman's conviction and requests that we affirm his conviction. We hold that a rational trier of fact could find Freeman guilty of attempted robbery beyond a reasonable doubt. Accordingly, we affirm Freeman's conviction of felony murder in the first degree.

## FACTS

### I. BACKGROUND

In September 2021, Michael Deda arranged to buy one half of a pound of methamphetamine (or "clear") from Soohui Kim for $1,200. Ex. 9A at 513. Deda and Kim started

texting at about 12:30 a.m. to set up the deal. Kim sent Deda her location—a motel in Puyallup—and stated that she was there with a friend. Deda told Kim at 3:01 a.m. that he was "not in the mood to meet anybody" but that he was on his way. *Id.* at 514. Deda stated that he needed to pick up the rest of the money in Tacoma, so Kim offered to meet Deda there instead. Deda provided Kim the address, stating that it was "apt 3," but the apartments in the building at the provided address are differentiated by letters, not numbers. *Id.* at 515. Deda claimed that the apartment was his aunt's home. Deda stated he would be "sitting out back waiting," and when Kim texted that she had arrived, Deda replied that he was coming to meet her. *Id.* at 516. However, surveillance footage from Freeman and Cody Smith's home showed that Deda was not at this location, but at Freeman and Smith's garage a few blocks away. Deda did not disclose to Kim that anyone else would be meeting her. When Deda saw vehicles drive by prior to Kim's arrival, he ducked behind a car in the garage.

Before Kim arrived, Freeman, Deda, and Smith had driven down the street to scope out the location of the incident. Freeman then dropped Deda off at Freeman and Smith's house. Freeman and Smith took a back-alley route to the meeting location, despite the fact that the location was right down the street, and brought handguns with them. The two men walked up and down the street before Kim arrived. Deda and Smith called each other multiples times between 4:05 and 4:27 a.m., while Deda was at the garage and Freeman and Smith were in the vicinity of the incident's location. At 4:27 a.m., Kim and her friend, Eric Pula, parked at the meeting spot.

When Kim and Pula pulled into the parking lot, Smith and Freeman appeared to stand behind an object near the sidewalk, out of Kim's and Pula's views. The men then approached the car; Smith stood on the passenger's side, and Freeman stood on the driver's side. It is unclear

2

whether Freeman stood directly at the driver's side window or if he stood further toward the front of the car, with a view through the front windshield. Smith stated to Pula, " 'I know your face.' " 5 Verbatim Rep. of Proc. (VRP) at 769. Pula replied in a loud, aggressive manner, with an attitude that "might get someone into a fight." 5 VRP at 763. Smith and Freeman then fired at least five bullets into the car—after the first shot, Kim started to drive away. A bullet travelled from the left side of Kim's chest, through her lungs and aorta, and exited the right side of her body. There were bullet holes on both the driver's and passenger's sides of the vehicle. Kim drove until she died and the car rolled into a utility pole. Pula exited the vehicle to find help. Police later obtained Kim's cell phone and backpack, containing methamphetamine, heroin, cocaine, fentanyl, and marijuana, from the car. Police also found two knives in Kim's car—one discovered between the driver's seat and center console, and another found in the cubby of the rear hatch of the car. A knife with a black handle was found on the ground near the car, but police determined that it was not relevant to the investigation.

About seven minutes after the shooting, Freeman and Smith returned to their residence, where Deda had remained. Footage from the porch camera of Smith's home showed that Smith had a fake tattoo on his left cheek immediately after the shooting, but that it disappeared approximately an hour later.

## II. TRIAL TESTIMONY AND POST-TRIAL PROCEDURAL HISTORY

About one week after being charged with Kim's murder, Freeman voluntarily spoke with detectives. Freeman told the detectives multiple versions of the events on the day of Kim's death. He first claimed that only Deda and Smith were present at the shooting. After detectives indicated that they knew that story was false, Freeman stated that he was present at the shooting but that he

did not have a gun. Finally, after detectives told him that guns were fired on both sides of the car, Freeman stated that Smith "had two guns and that he ran around the car and shot both sides." 8 VRP at 72. Freeman told detectives that Deda had wanted to "skin," or rob, Kim. *Id.* at 69. According to Freeman, Smith had proclaimed that he wanted to "make [Deda] proud"—one of the detectives took this statement to mean that Smith was going to shoot or rob Kim. *Id.* at 77. Freeman also stated that Deda harbored animosity toward Kim because of a rumor that Deda's wife died from overdosing on " 'some bad dope' " from Kim, but Deda's wife died from a heart attack, not an overdose. 7 VRP at 1180. Freeman relayed to detectives that Kim's attempt to drive away "precipitated the shooting." 8 VRP at 90.

Pula was also interviewed by police and testified at trial. At the time of the shooting, Pula was under the influence of drugs, fading in and out of consciousness. Pula testified that he had "an exchange of words" with a male standing outside of his window. 5 VRP at 760. He stated that the windows of Kim's car were tinted, so it was difficult to see out of them, but that the window was slightly rolled down. On cross-examination, Pula indicated that it "didn't seem at the time that anyone was trying to rob [him]." *Id.* However, in his police interview, Pula stated that he was looking out of the window of Kim's car to figure out if someone was trying to rob her, and that Pula ultimately thought that the men who approached the car were not trying to rob them because "they didn't ask for anything." *Id.* at 768. Pula had stated in his interview that Smith wore a mask. He indicated at trial that he did not remember what he told police in his interview because he had been under the influence, but that he would not have lied to them.

Freeman testified at trial. He stated that he and Deda sell drugs and have made deals together in the past. At the time of the shooting, Freeman "had to make money" to support his

4

pregnant girlfriend. 8 VRP at 35. Freeman also testified that he met with Kim to buy drugs on Deda's behalf, not to rob Kim or to kill her. According to Freeman, Deda wanted the methamphetamine as payment for work that Deda was doing on Freeman's car. Freeman and Deda originally agreed that Freeman would pay Deda $1,000 and "some [SKAR] 18 audios," but Deda wanted methamphetamine instead. 7 VRP at 1119. Freeman had over $3,000 in his possession on the day of the shooting, and Deda had about $500. Freeman stated that he and Smith met Kim instead of Deda because Deda did not "want to interact with another person" due to his wife's passing. *Id.* at 1120. Freeman asserted that he did not remember the multiple calls that Smith and Deda made to each other. He also stated that he was he was "not sure" if he noticed Smith's fake tattoo. *Id.* at 1140.

Freeman also testified as to what happened during the shooting. According to Freeman, Smith had approached Kim's vehicle first to determine whether she was the person they were supposed to meet. Smith and Pula started "getting into it" as Freeman approached Kim's car. *Id.* at 1153. Freeman stated that Smith told Pula that he " 'knew [Pula's] face,' " to which Pula replied, " 'What the f*** you mean you know my face?' " *Id.* at 1123. Freeman testified that after approaching Kim's car, he stood on the driver's side with a view through the front windshield. Freeman stated that he then saw Pula grab a black handle that "looked like a pistol." *Id.* at 1155. Freeman also thought that Pula may have tried to open the car door. According to Freeman, Smith stated, " 'He's reaching,' " before Smith started shooting. 8 VRP at 16. Freeman testified that he started shooting as well because he feared for his life. After the shooting started, Freeman stated that he and Smith moved to opposite sides of the vehicle, so that Freeman was on the passenger's side and Smith was on the driver's side. Freeman asserted that he did not intend to shoot Kim.

Freeman testified that he had lied in his police interview because the detectives were determined to "just throw [him] away." 7 VRP at 1133. He stated that one detective repeatedly claimed during the interview that Freeman was the killer, but he could not find that statement in the interview transcript.[1] When Freeman was asked why he did not simply provide Deda with the money that he could have used to buy the meth himself, Freeman stated, "[Deda] wanted the half-pound of clear." *Id.* at 1145. Freeman denied that he had told the detectives that Deda wanted to "skin" Kim. *Id.* at 1160. The prosecutor insinuated during cross-examination that Smith was trying to intimidate Pula by saying, " 'I know your face,' " but Freeman disagreed. 8 VRP at 54.

The jury found Freeman guilty on all counts: first degree felony murder (count 1), second degree murder (count 2), first degree assault (count 3), unlawful possession of a firearm (count 4), attempted first degree robbery (count 6), and conspiracy to commit first degree robbery (count 8). The trial court vacated counts 2, 6, and 8. The trial court sentenced Freeman to 744 months of confinement. Freeman appeals his judgment and sentence.

## ANALYSIS

Freeman argues that his felony murder conviction must be reversed and dismissed for insufficient evidence because the State presented insufficient evidence that he committed attempted robbery.[2] We disagree.

---

[1] This detective later testified that she did not recall ever saying that to Freeman and that her interview style is nonconfrontational.

[2] Although Freeman references, in his brief, the sufficiency of the evidence showing he committed either robbery or attempted robbery, he clarifies in his argument section that the prosecutor specifically elected attempted robbery, not completed robbery, as the predicate crime for the felony murder and "[t]hus, the issue in this case is whether there was sufficient evidence of an attempted robbery." Br. of Appellant at 16. Accordingly, we do not address whether sufficient evidence would have supported a finding that Freeman committed a completed robbery.

*A. Legal Principles*

We review challenges to the sufficiency of the evidence de novo. *State v. Berg*, 181 Wn.2d 857, 867, 337 P.3d 310 (2014). When reviewing a sufficiency of the evidence claim, we must determine " 'whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt.' " *In re Pers. Restraint of Arntsen*, 2 Wn.3d 716, 724, 543 P.3d 821 (2024) (quoting *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992)). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119 Wn.2d at 201. This standard of review is deferential, "and questions of credibility, persuasiveness, and conflicting testimony must be left to the jury." *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 364, 256 P.3d 277 (2011). Circumstantial and direct evidence are considered equally reliable on appeal. *State v. Goodman*, 150 Wn.2d 774, 781, 83 P.3d 410 (2004).

To convict Freeman of first degree felony murder, the State was required to prove beyond a reasonable doubt that Freeman "or an accomplice . . . caused the death of Soohui Kim in the course of or in furtherance of," or in "immediate flight" from, an attempt to commit robbery in the first degree. Clerk's Papers at 167. The crime of attempted robbery in the first degree requires intent and a substantial step toward taking a victim's personal property in their presence while armed, using fear, force, or the threat of immediate force. RCW 9A.28.020; RCW 9A.56.190; RCW 9A.56.200. A person is liable as an accomplice if they help, or agree to help, someone in "planning or committing" a crime. RCW 9A.08.020(3)(a)(ii). An accomplice must know that their actions "promote or facilitate the commission of the crime." RCW 9A.08.020(3)(a). A jury may

infer accomplice liability from a totality of the facts and circumstances. *State v. Zghair*, 4 Wn.3d 610, 623-24, 567 P.3d 1 (2025).

*B. Application*

Freeman argues that there is "no evidence, only speculation based on circumstantial evidence, that what [Deda, Freeman, and Smith] planned was specifically a robbery." Br. of Appellant at 17. However, a rational trier of fact could determine that what occurred was an attempted robbery, not simply "a drug deal gone wrong." *Id.* at 18. We, therefore, conclude that there is sufficient evidence on which a rational trier of fact could conclude that Freeman committed attempted robbery.

Deda, a drug dealer who was simultaneously in communication with Smith and Kim, convinced Kim to bring one half of a pound of methamphetamine to an address very close to Smith and Freeman's home. Freeman was also a drug dealer, needed money, and was asked to pay Deda in methamphetamine instead of money. Deda, Smith, and Freeman all travelled to the location of the incident, then Deda returned to Smith and Freeman's home. Deda lied to Kim when he stated that he would meet her at the drop-off location and did not mention Freeman or Smith. While waiting for Kim to arrive, Deda hid from passing vehicles. Smith attempted to conceal his identity by wearing a fake tattoo and a mask during the encounter with Kim and Pula. Freeman and Smith brought guns to the purported drug deal. Smith stated that he "knew [Pula's] face" moments before shooting at him. Finally, Freeman stated that Deda wanted to "skin" Kim in his interview with detectives.

Considered as a whole, the facts support the conclusion that Freeman attempted to rob Kim of her drugs. A rational trier of fact could determine that Deda wanted to steal Kim's drugs and

sent Freeman and Smith to rob her. They could also find that Freeman both intended to rob Kim and took a "substantial step" towards doing so by approaching her vehicle and shooting. Although no evidence suggests that Freeman stated anything when he and Smith were standing at Kim's vehicle, Smith stated, "I know your face," and then opened fire on the car after Pula replied in an "aggressive manner." Freeman fired at the vehicle as well. A rational trier of fact could infer accomplice liability from these facts and determine that Freeman's actions facilitated the robbery attempt.

Freeman also argues that Pula's aggressive tone and the version of events to which Pula testified indicate that the shooting was not the result of an attempted robbery. Pula stated at trial that he did not think anyone was trying to rob him, and that the man at the window did not ask him for anything. The State responds that Pula's reaction to Freeman and Smith cannot "erase" the intent that Freeman and Smith possessed when they approached the car. Br. of Resp't at 19. We agree with the State. Although Pula may have "interfered" with a robbery attempt, *id.*, the State's evidence is sufficient to prove that Freeman had the intent to rob Kim and took a substantial step towards doing so.

Freeman offers multiple alternative explanations to an attempted robbery—he posits that Deda may have sought revenge on Kim for the death of his wife or that Deda saw Kim as a rival dealer. Not only are these scenarios not factually supported, but questioning alternative intent falls outside this court's responsibilities. We are tasked not with weighing possible explanations for Freeman's conduct, but concluding whether "any rational trier of fact could have found guilt beyond a reasonable doubt." *Salinas*, 119 Wn.2d at 201. We hold that a rational trier of fact could

have found that Freeman committed attempted robbery beyond a reasonable doubt. Thus, his conviction for felony murder is supported by sufficient evidence.

## CONCLUSION

After viewing the evidence in the light most favorable to the State, we hold that a rational trier of fact could find that Freeman committed attempted robbery in the first degree, the predicate offense for Freeman's felony murder conviction. Accordingly, we affirm Freeman's conviction for felony murder.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, C.J.

We concur:

VELJACIC, J.

PRICE, J.